COURT OF APPEALS









COURT
OF APPEALS

EIGHTH
DISTRICT OF TEXAS

EL
PASO, TEXAS

 

LUIS GONZALEZ,                                               )

                                                                              )               No.  08-01-00451-CR

Appellant,                          )

                                                                              )                    Appeal from the

v.                                                                           )

                                                                              )                 34th District Court

THE STATE OF TEXAS,                                     )

                                                                              )           
of El Paso County, Texas

Appellee.                           )

                                                                              )              
(TC# 20010D02529)

                                                                              )

 

 

O
P I N I O N

 

Appellant Luis
Gonzalez was indicted and tried for the murder of Lorenza
Orozco.  The jury found Appellant guilty
of the lesser-included offense of manslaughter and assessed punishment of 18
years=
imprisonment and a fine of $10,000.  On
appeal, Appellant raises eight issues, in which he challenges the legal and
factually sufficiency of the evidence to sustain his conviction and argues that
the trial court erred in admitting evidence seized from his home without his
effective consent and erred in admitting into evidence his purported statement
which was not voluntarily given.  We
affirm.

 








On the evening of
October 6, 2000, Appellant shot his wife Lorenza
Orozco with a 

12-gauge shotgun
during an argument in their home. 
Ms. Orozco died as a result of the injuries she sustained.  Appellant and the victim had been together
for over three years and had a 

two-year-old
son.  They had a lot of problems in their
relationship and financial disagreements. 
That evening, Appellant got out of work around 8:30 p.m. and went to the
Lamplighter Bar, a strip club, and drank a couple of beers.  About half an hour later, Ms. Orozco entered
the club, went to Appellant=s
table, and started yelling at Appellant. 
The club=s bouncer
threw the couple out.  Appellant arrived
home first and as he got out of his vehicle, Ms. Orozco pulled up and almost
ran him over.  Appellant went to her
vehicle, picked up their son from the back seat, and went into the house.  Appellant recalled that while he was closing
the door, Ms. Orozco hit him in the mouth. 
Appellant put his sleeping son on the sofa and he and Ms. Orozco
continued arguing.








In his statement
to police, Appellant stated that during the argument he grabbed Ms. Orozco
and shook her from the arms and stated that she was getting out of hand.  He then called her mother and told her what
was happening and that he could not stand Ms. Orozco and did not want her there
anymore.  Ms. Orozco grabbed a lamp and
Appellant hung up the phone and went upstairs. 
Appellant then went into his room, grabbed a shotgun that he kept loaded
in his closet and went back downstairs. 
Appellant told Ms. Orozco to shut up and leave, but she kept going on
and calling him names.  Appellant pulled
on the trigger and the shotgun went off. 
Ms. Orozco fell to the floor and he walked upstairs and put the shotgun
away.  Appellant returned and picked up
his son who was crying.  He then called
911 and told them to come quickly because he had shot his wife
accidentally.  Appellant stated that he
did not want to shoot her, he just wanted to scare
her.

At trial,
Appellant offered contrary testimony concerning the immediate events leading up
to the shooting.  Appellant testified
that after they returned home and during their argument, his brother-in-law
called on the phone.  Appellant gave the
phone to Ms. Orozco and while she was on the phone, he went upstairs to take a
shower.  Ms. Orozco followed Appellant
upstairs and came towards him, threw something at him, and started yelling at
him and hitting him.  Appellant then
picked up the 12-gauge shotgun, which was behind the 9-millimeter gun, on the
top shelf in the closet.  Appellant
stated that he wanted to scare her and calm her down.  Appellant testified that he did not grab the
9-millimeter because he knew it was loaded, but knew the shotgun was not
loaded.  Appellant went downstairs,
carrying the shotgun, and Ms. Orozco followed behind him.  She kept on hitting him, so he called his
mother-in-law.  After he hung up the
phone, Ms. Orozco swung at him and threw something at him.  Appellant picked up the shotgun, which was on
top of the counter and put it by his side. 
Appellant pointed the shotgun at Ms. Orozco.  Ms. Orozco had something in her hand and
swung at him and Appellant told her to stop. 
When she did it again, Appellant flinched and the gun went off.  Ms. Orozco grabbed her arm and asked
Appellant to call 911.  At first,
Appellant could not react and did not respond to her.  Appellant testified that he was in shock
because the gun should have never been loaded. 
Ms. Orozco then yelled at him to call 911 and he did.








After calling 911
and speaking with the operator, Appellant picked up his son, heard the
ambulance, and ran outside.  His
neighbor, Anthony Martinez had just returned home when he saw Appellant=s door open.  Mr. Martinez was walking up to the door when
Appellant walked out.  Appellant told Mr.
Martinez that he had shot his wife and walked past Mr. Martinez.   Appellant appeared very sad and quiet.  Appellant went into the street, waved to the
ambulance, and then walked back in the house.

El Paso Police
Officers Adrian Estrada and Joe Lopez were the first officers to arrive at the
scene.  When they entered the kitchen,
they observed Appellant on the phone and holding a small child.  Officer Lopez ordered Appellant to hang up
the phone, put down the child, and put his hands up.  Officer Estrada recalled that Appellant was
quiet, but kind of shocked, and complied with all the orders.  Officer Estrada placed Appellant in handcuffs
and escorted him out to the patrol unit. 
Then Officer Estrada sat Appellant down in the back of the unit and
watched him.

Officer Erik
Messer and his partner Steven Lopez entered the residence directly behind
Officers Estrada and Joe Lopez.  Officer
Messer observed the officers placing Appellant in handcuffs and made his way to
the victim.  She was lying on the floor
in the den, suffering from an obvious gunshot wound.  Officer Messer saw she had a large gaping
hole in her upper right torso and the elbow area of her arm was severely torn
up.  Ms. Orozco had a very faint pulse
and was not talking or responding.  He
and another officer were about to do CPR when EMS arrived and took over the
victim.








Officer Messer
then assisted other officers in clearing the house to look for possible
victims, suspects, or weapons, as a safety concern.  Officer Messer went upstairs to the bedroom
area and observed two weapons, a shotgun and a handgun, in an open closet on
the shelf.  The officer noticed that the
shotgun still had the spent round in the chamber or the port ejection.  After the officer located the weapons, he
advised the sergeant on the scene.  By
then, they had learned that there were no outstanding suspects or victims and
Officer Messer was asked to go outside and secure the perimeter.  Officer Messer testified that he did not tag
the shotgun as evidence nor was he told by anyone where the gun was located.

Officer Estrada
testified that he did not say anything to Appellant when he put him in the back
of the patrol unit.  At that time, his
partner Joe Lopez was inside the residence, trying to find weapons and was
trying to get a hold of Officer Estrada on his radio.  Officer Lopez came out of the residence and
told Officer Estrada to read Appellant his rights.  Officer Lopez then asked Appellant Awhere are the guns@ and Appellant replied, Aupstairs.@  Officer Estrada recalled that Appellant began
yelling out for his son and wife and that it seemed like he was going into a
little bit of shock, either rocking back and forth or side to side.[1]  Since Appellant appeared to be  going into a seizure, Officer Estrada called
out for help, pulled Appellant out of the unit, and an ambulance showed up to
transport Appellant to Del Sol Medical Center. 
Officer George Spencer, who had been canvassing the area for witnesses,
was called over to the patrol car and told to ride in the ambulance.  Officer Spencer observed Appellant sitting on
the curb and gasping for air.  Officers
Estrada and Spencer rode in the ambulance with Appellant to the hospital.  Officer Estrada recalled that during the
ambulance ride, Appellant said, AI
can=t breathe.@  Appellant had on an oxygen mask for about
half the trip, and eventually passed out. 
Officer Spencer recalled that Appellant=s
eyes were closed and he was kind of shaking around as if having some sort of
seizure or something.  The EMTs were tapping his eyes and saying his name.  Appellant=s
eyes were flinching, but he made no verbal response.








When they arrived
at the hospital, Appellant was taken to an examining room.  Officer Spencer recalled that Appellant was
handcuffed behind his back and at the time, his hands were wrapped in paper to
protect evidence of gunpowder residue. 
Appellant was complaining that his hands were numb, so Officer Spencer
handcuffed Appellant to the bed rail. 
Officer Spencer recalled that Appellant was asking about his wife=s condition.

Crime Scene Officer
Mark Fernandez was dispatched to Del Sol hospital at 11:45 p.m. to obtain
photographs and evidence.  Officer
Fernandez took photographs of Appellant and noted that he was handcuffed to the
rails, had blood on his clothing, and his hands were bagged and taped.  Officer Fernandez unbagged
Appellant=s hands
and tested for gunpowder traces with a collection kit.  The officer also took Appellant=s clothes and shoes, and later turned these
items and the collection swabs over to Officer Tom Garcia.  Officer Fernandez recalled that Detective Chavarria was not initially at the hospital when he
arrived, but showed up while he was there. 
Officer Fernandez was advised by Sergeant Valenzuela to go to the crime
scene to map the wall of blood splatter. 
Officer Fernandez left Del Sol at 1:07 a.m.  When he arrived at the residence, officers
were still standing by waiting for the videotaping and photographing of the
scene.








Wanda Guerrero
Sanchez, a registered nurse at Del Sol Medical Center, was the emergency room
triage nurse on duty when Appellant was brought into the hospital by the
police.  Ms. Sanchez testified that at
that time, Appellant was not voicing complaints because he would not talk with
medical staff.  They took Appellant=s vital signs and Ms. Sanchez did an
assessment on him.  While Ms. Sanchez was
in the hallway, Jose Rodriguez, the physician=s
assistant on duty that night, entered Appellant=s
room and dropped a metal overbed tray on the
floor.  Appellant
immediately responded and jumped, fully awake.  Appellant did not seem to be in a state of
shock because he snapped out of his unresponsiveness so readily with a loud
noise.  Appellant did not exhibit any
symptoms consistent with a postictal state following
a seizure.  Ms. Sanchez recalled
from her nursing notes that Appellant came into the hospital at 11:45 p.m. and
was released by the physician into police custody at 1:05 a.m.  Ms. Sanchez recalled giving Appellant two
hospital gowns, covering his front and back, because the police had taken
Appellant=s
clothes.  When he was leaving, Ms.
Sanchez got shoe covers for his feet and wrapped him in a warm blanket.

Detective Gonzalo Chavarria, of the Crimes Against Persons (ACAP@)
Division in the El Paso Police Department, arrived at the scene of the
shooting at approximately midnight and was advised to go to Del Sol Hospital to
start his investigation.  Detective Chavarria arrived at the hospital at approximately 12:45
a.m.  While there, Detective Chavarria was advised by his supervisors to obtain
Appellant=s consent
to enter his home for investigative purposes. 
Detective Chavarria read Appellant his rights
and read the consent to search form, which states that he can refuse to consent
to the search.  Detective Chavarria testified that Appellant read the form,
understood it, and signed it.  After
obtaining the consent form, Detective Chavarria met
with the medical staff attending to Appellant. 
Appellant was cleared by medical staff for release and transported to
police headquarters.








Upon arriving at
police headquarters, Appellant was turned over to Detective Chavarria=s custody in the CAP office.  They went into an interview room and
Detective Chavarria read Appellant his Miranda
rights, and Appellant signed and initialed each paragraph of the Miranda
warning card.  Appellant agreed to waive
his rights and give a statement. 
Detective Chavarria testified that during the
time he took the statement, Appellant did not tell him he wanted to cease the
interview and he was not coerced or threatened in any way to give a
statement.  Detective Chavarria
also testified that he did not directly or indirectly promise Appellant
anything in return for his statement and stated that he was not denied any
basic necessities like food or going to the restroom.  Appellant read the statement on the computer
monitor as Detective Chavarria typed and after it was
finished, the detective gave Appellant a printed copy, which Appellant read
aloud.  Appellant initialed every
paragraph and wanted no additions, deletions, or alterations to the
statement.  Appellant signed the document
in the detective=s presence,
which was witnessed by Officer Spencer and Officer Gabriel Espalin.

Crime Technician
Officer Thomas Garcia arrived at Appellant=s
residence at approximately midnight. 
When Sergeant Valenzuela arrived about an hour later, Officer Garcia was
assigned the duty of collecting evidence at the crime scene.  Officer Garcia collected several items of
evidence, including assorted ammunition from the kitchen pantry, a box of .38 caliber ammunition, a box of 9-millimeter ammunition
found inside the kitchen cabinet, and an empty box of Federal brand shotgun
ammunition found in the upstairs bedroom closet.  In the upstairs bedroom closet, Officer
Garcia also recovered a loaded 9-millimeter pistol, a loaded Mossberg 12-gauge
shotgun, one spent shotgun shell taken from the receiver of the ejection port
of the shotgun, and after unloading the shotgun, four live shotgun rounds
inside the recoil tube.








Joseph Correa, a
firearms examiner for Texas DPS at the El Paso Crime Lab, conducted various
tests on the 12-gauge shotgun in evidence and testified as a firearms expert
for the State.   Mr. Correa determined
that the shotgun was functioning properly and had two safety locks, a sear that
keeps the firing pin back and another on top of the receiver that was a trigger
lock.  Though he had heard of a shotgun
firing when dropped, he saw no reason why this shotgun should fire if
dropped.  According to Mr. Correa, the
shotgun in evidence was a slide-action or pump shotgun.  In closed position, one inserts the shotshells into the tube of the magazine in the body.  To load it, one would pull it forward and
backwards, causing the lift to come down with the first stop opening to allow
the shell to pop onto the lift and the second stop keeping the rest of the
shells from coming down and jamming the firearm.  Then one would rack it forward again, causing
the lift to rise, the bolt to move forward, and the chambering of the round.  In order to fire the weapon, it would have
had to have already been racked.  Mr.
Correa also testified that the shotgun held a capacity of five three-inch shotshells, four in the magazine and one in the
chamber.  According to Mr. Correa, the
five bullets recovered from the shotgun were three-inch shotshells.

The jury found
Appellant guilty of the lesser-included offense of manslaughter and assessed
punishment at eighteen years=
imprisonment and a $10,000 fine. 
Appellant=s motion
for new trial was overruled by operation of law.  Appellant now brings this appeal.

In four related
issues, Appellant challenges the legal and factual sufficiency of the evidence
to sustain his conviction for manslaughter.

Standards
of Review








In reviewing the
legal sufficiency of the evidence, we must view the evidence in the light most
favorable to the verdict to determine whether any rational trier
of fact could have found the essential elements of the crime beyond a
reasonable doubt.  Jackson
v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781,
2788-89, 61 L.Ed.2d 560, 573 (1979); Lacour
v. State, 8 S.W.3d 670, 671 (Tex.Crim.App. 2000).  We must evaluate all of the evidence in the
record, whether it was admissible or inadmissible.  Wilson v. State, 7
S.W.3d 136, 141 (Tex.Crim.App. 1999); Johnson v.
State, 967 S.W.2d 410, 412 (Tex.Crim.App. 1998).  We do not resolve any conflict of fact, weigh
any evidence, or evaluate the credibility of any witnesses, as this was the
function of the trier of fact.  See Adelman v.
State, 828 S.W.2d 418, 421 (Tex.Crim.App. 1992); Matson
v. State, 819 S.W.2d 839, 843 (Tex.Crim.App.
1991).  Instead, our duty is to determine
whether if both the explicit and implicit findings of the trier
of fact are rational by viewing all the evidence admitted at trial in the light
most favorable to the verdict.  See Adelman, 828 S.W.2d at 421-22.  In so doing, any inconsistencies in the
evidence are resolved in favor of the verdict. 
Matson, 819 S.W.2d at 843.

In reviewing a
factual sufficiency challenge, we view all of the evidence in a neutral light,
both for and against the verdict, to determine whether it demonstrates that the
proof of guilt is so obviously weak as to undermine our confidence in the jury=s determination, or the proof of guilt,
although adequate if taken alone, is greatly outweighed by contrary proof.  Johnson v. State, 23
S.W.3d 1, 11 (Tex.Crim.App. 2000); Clewis v. State, 922 S.W.2d 126, 134 (Tex.Crim.App. 1996). 
We review the evidence supporting a disputed fact and compare it to
evidence tending to disprove that fact.  Johnson,
23 S.W.3d at 6-7; Jones v. State, 944 S.W.2d 642, 647 (Tex.Crim.App. 1996), cert. denied, 522 U.S. 832, 118
S.Ct. 100, 139 L.Ed.2d 54 (1997).  Although we are authorized to disagree with
the jury=s
determination, we must give due deference to the jury=s
assessment of the weight and credibility of the evidence to avoid substituting
our judgment for that of the fact finder. 
Johnson, 23 S.W.3d at 7; Jones,
944 S.W.2d at 648.  We will set aside a
verdict only where the evidence supporting guilt is so obviously weak or the
contrary evidence so overwhelmingly outweighs the supporting evidence as to
render the conviction clearly wrong and manifestly unjust.  Ortiz v. State, 93 S.W.3d 79, 87 (Tex.Crim.App. 2002), cert. denied, 123 S.Ct. 1901, 155 L.Ed.2d 824 (2003).








Manslaughter

In this case,
Appellant was charged with murder, but at trial, the jury was also instructed
on the lesser-included offenses of reckless manslaughter and criminally
negligent homicide.[2]  The jury found Appellant guilty of
manslaughter.  A person commits
manslaughter if he recklessly causes the death of an individual.  See Tex.Pen.Code Ann. '
19.04(a)(Vernon 2003). 
Section 6.03(c) of The Texas Penal Code provides:  

A person acts recklessly, or is
reckless, with respect to circumstances surrounding his conduct or the result
of his conduct when he is aware of but consciously disregards a substantial and
unjustifiable risk that the circumstances exist or the result will occur.  The risk must be of such a nature and degree
that its disregard constitutes a gross deviation from the standard of care that
an ordinary person would exercise under all the circumstances as viewed from the
actor=s
standpoint.

 

Tex.Pen.Code Ann. '
6.03(c)(Vernon 2003).

 








To obtain a
conviction for manslaughter, the State must prove that:  (1) the risk that the defendant perceived was
both substantial and unjustifiable; and (2) the defendant=s disregard of the risk constituted a
gross deviation from the ordinary standard of care.  See Tex.Pen.Code Ann. '
6.03(c).  Under the Texas Penal Code, a
person commits criminally negligent homicide by causing the death of an
individual by criminal negligence.  See
Tex.Pen.Code Ann. ' 19.05(a).  In defining criminal negligence, Section
6.03(d) of the Penal Code provides:

A person acts with criminal negligence,
or is criminally negligent, with respect to circumstances surrounding his
conduct or the result of his conduct when he ought to be aware of a substantial
and unjustifiable risk that the circumstances exist or the result will
occur.  The risk must be of such a nature
and degree that the failure to perceive it constitutes a gross deviation from
the standard of care that an ordinary person would exercise under all the circumstances
as viewed from the actor=s
standpoint.

 

Tex.Pen.Code Ann. '
6.03(d).

 

On appeal,
Appellant argues that if he is guilty, he is guilty of the lesser-included
offense of criminally negligent homicide, rather than manslaughter, because he
failed to perceive the injury or death that could result from his conduct
because he thought the shotgun was unloaded. 
Therefore, the only disputed element on appeal is Appellant=s mental state, that is, whether he was
aware of a substantial and unjustifiable risk created by his conduct and
consciously disregarded it, or whether he was unaware of the risk involved or
failed to perceive that risk.  See
Lewis v. State, 529 S.W.2d 550, 553 (Tex.Crim.App.
1975)(difference between criminally negligent homicide
and involuntary manslaughter, now manslaughter, is the culpable mental state
required to establish each offense). 
Proof of a culpable mental state often relies on circumstantial
evidence, and in comparing recklessness versus criminal negligence, is a
conclusion to be drawn by the trier of fact through
inference from all the circumstances.  Dillon v. State, 574 S.W.2d 92, 94 (Tex.Crim.App.
1978).








In this case,
according to his statement, Appellant and Ms. Orozco were in the middle of an
argument when he went upstairs to his room and grabbed a shotgun that he kept
loaded in the closet.  Appellant then
returned downstairs, continued arguing with Ms. Orozco, and then pulled on the
trigger and the shotgun went off. 
Appellant stated that he did not want to shoot her, but only intended to
Ascare her.@  At trial, Appellant testified that he grabbed
the shotgun because he knew is was not loaded, had
never loaded the shotgun, did not know how the safety worked, and had never
test fired the shotgun, which he had purchased used in December 1999.  Appellant denied that he racked the shotgun
and did not know who had racked it. 
Officer Garcia recovered assorted ammunition and other evidence at
Appellant=s
residence, including a box of .38 caliber ammunition, a box
of 9-millimeter ammunition, and an empty box of Federal brand shotgun
ammunition from the upstairs bedroom closet. 
In addition to the loaded shotgun, Officer Garcia recovered a loaded
9-millimeter pistol.  Firearms expert Joseph
Correa testified that Appellant=s
shotgun was functioning properly, and in order to fire this type of shotgun, it
would have had to have already been racked. 
Though Appellant testified that he had never taken a firearms safety
course, he admitted that he had owned other guns before.








Based on the
evidence viewed in a light most favorable to the verdict, the jury could
reasonably infer that Appellant knew the shotgun was loaded when he pointed it
at Ms. Orozco and knew the risk of potential injury created by his conduct given
his familiarity with guns and his intention of scaring the victim.  See Thomas v. State, 699 S.W.2d 845,
850 (Tex.Crim.App. 1985)(AEvidence that a defendant knows a gun
is loaded, that he is familiar with guns and their potential for injury, and
that he points a gun at another, indicates a person who is aware of a risk
created by that conduct and disregards the risk,@
not entitling a defendant to an instruction on criminally negligent
homicide).  The evidence also supports
the inference that Appellant consciously disregarded the risk created by his
conduct by pulling on the trigger while the gun was pointed at Ms. Orozco.  We conclude that the evidence was legally
sufficient to sustain Appellant=s
conviction for manslaughter.  Further, we
conclude the evidence is also factually sufficient because the proof of guilt
was not so obviously weak nor was the contrary evidence so overwhelmingly outweighed
by the supporting evidence as to render the conviction clearly wrong and
manifestly unjust.  Although at trial,
Appellant denied knowing that the shotgun was loaded and testified that he did
not know how the gun operated or how the safety worked, the jury was free to
believe all, some, or none of Appellant=s
testimony.  See Johnson, 23 S.W.3d
at 9 (The trier of fact is the sole judge of the
credibility of the witnesses and the weight to be given their testimony.).  A decision is not manifestly unjust merely
because the fact finder resolved conflicting evidence in favor of the
State.  Cain v.
State, 958 S.W.2d 404, 410 (Tex.Crim.App. 1997).  Finding the evidence both legally and
factually sufficient to sustain Appellant=s
conviction, we overrule Issues One through Four.

Suppression
of Evidence








In Issues Five and
Six, Appellant contends the trial court erred in admitting evidence seized at
his home without his effective consent to the search.  In Issues Seven and Eight, Appellant argues
the trial court erred in admitting his statement to the police because it was
not voluntarily given.  The trial court
held a pretrial hearing on Appellant=s
motion to suppress his written statement. 
At the conclusion of the hearing, the trial court denied the
motion.  Appellant later filed a motion
to suppress all physical evidence obtained from Appellant=s arrest and search and seizure of his
property without valid consent.  Prior to
voir dire, Appellant argued his motion to suppress
the physical evidence to the trial court. 
The trial court reserved its ruling at that time and later denied this
motion prior to opening statements without stating the basis for its
ruling.  During the State=s case-in-chief, Appellant repeatedly
re-urged his motions to suppress evidence with respect to Appellant=s consent to the search of his
residence and his written statement to police. 
The trial court overruled his objections and admitted physical evidence
obtained from the consent search and Appellant=s
written statement.  During the defense=s case-in-chief, Appellant testified
regarding the suppression issues and the State cross-examined Appellant on the
same.

Standard
of Review








A trial court has
broad discretion in determining the admissibility of the evidence and we will
not set aside the trial court=s
ruling absent a clear abuse of discretion. 
Allridge v. State, 850 S.W.2d 471, 492 (Tex.Crim.App.
1991).  When reviewing a trial
court=s ruling
on a motion to suppress evidence, we apply a bifurcated standard of review, in
which we give almost total deference to the trial court=s
determination of historical facts that turn on an evaluation of credibility and
demeanor and review de novo its application of the law to those
facts.  Carmouche v. State,
10 S.W.3d 323, 327 (Tex.Crim.App. 2000); Guzman v.
State, 955 S.W.2d 85, 89 (Tex.Crim.App. 1997).  When the trial court does not make explicit
findings of historical fact, we review the evidence in the light most favorable
to the trial court=s
ruling.  Walter v.
State, 28 S.W.3d 538, 540 (Tex.Crim.App. 2000).  In determining whether a trial court=s ruling on a motion to suppress is
supported by the record, an appellant court generally considers only the
evidence adduced at the suppression hearing unless the suppression issues have
been consensually re-litigated by the parties during the trial on the
merits.  See Rachal
v. State, 917 S.W.2d 799, 809 (Tex.Crim.App.
1996), cert. denied, 519 U.S. 1043, 117 S.Ct.
614, 136 L.Ed.2d 539 (1996).  When the
issue is consensually re-litigated by the parties at trial, as in this case, we
consider the evidence presented at the hearing as well as the evidence
presented at trial.  Rachal,
917 S.W.2d at 809. 
The trial court=s
ruling should be upheld if it is correct on any theory of law applicable to the
case.  State v. Ross,
32 S.W.3d 853, 855-56 (Tex.Crim.App. 2000).

Emergency
Doctrine

On a motion to
suppress evidence, the accused bears the initial burden of rebutting the
presumption that police conduct was proper. 
Russell v. State, 717 S.W.2d 7, 9 (Tex.Crim.App. 1986). 
The accused rebuts this presumption by showing that the search or
seizure occurred without a warrant.  Id.  If the State conducted a search without a
warrant, the burden shifts to the State to prove that the warrantless
search or seizure was reasonable.  See
id. at 9-10. 


Within Issues Five
and Six, Appellant first contends that physical evidence, specifically the
shotgun and handgun, was illegally seized when police officers entered his
residence at a time prior to obtaining Appellant=s
alleged written consent to search.  We
will address Appellant=s
argument concerning the initial search of his residence upon his arrest before
considering the voluntariness of his written consent,
which was obtained while Appellant was in custody at the hospital.








The Fourth
Amendment to the United States Constitution as well as Article I, section 9 of
the Texas Constitution prohibit unreasonable searches
and seizures.  See U.S. Const. Amend. IV;
Tex.Const. art. I, ' 9.  To justify a warrantless
search of a residence under the emergency doctrine exception, the State must
show that:  (1) the officer had probable
cause to at the time the search was made; and (2) the officer had an immediate
reasonable belief that he or she must act to Aprotect
or preserve life or avoid serious injury.@[3]  See Mincey v.
Arizona, 437 U.S. 385, 392-93, 98 S.Ct. 2408,
2413, 57 L.Ed.2d 290 (1978); Brimage v.
State, 918 S.W.2d 466, 500-02 (Tex.Crim.App. 1996)(plurality op. on reh=g), cert. denied, 519 U.S. 838,
117 S.Ct. 115, 136 L.Ed.2d 66 (1996); McNairy v.
State, 835 S.W.2d 101, 106 (Tex.Crim.App.
1991).  We apply an objective standard of
reasonableness in determining whether a warrantless
search is justified under the emergency doctrine.  Brimage, 918 S.W.2d at 501; Gipson v. State, 82 S.W.3d 715, 720 (Tex.App.--Waco 2002, no pet.).  Using this objective standard we evaluate
police conduct, taking into account the facts and circumstances known to the
police at the time of the search.  See
Colburn v. State, 966 S.W.2d 511, 519 (Tex.Crim.App.
1998); Brimage, 918 S.W.2d at 501.  The police may seize any evidence that is in
plain view during the course of their legitimate emergency activities.  Mincey v. Arizona, 437 U.S. at 393, 98 S.Ct.
at 2413; Brimage, 918 S.W.2d at 501.

In this case,
Appellant called 911 and requested emergency assistance because he had shot his
wife accidentally.  Officer Estrada
testified that he and his partner Joe Lopez were dispatched to a Code III
shooting, family violence, at 8308 Mettler
Drive.  The officers passed a staging
area where the fire truck and ambulance were waiting because there was a weapon
involved.  Officers Estrada and Lopez
entered the residence and observed Appellant standing in the kitchen with a
small child.  Appellant was immediately
arrested.








Officer Erik
Messer testified that he was also dispatched on a shooting call at the same
location.  Officer Messer and his partner
entered the residence directly behind Officers Estrada and Lopez.  Officer Messer observed that Ms. Orozco was
lying on the floor with an obvious gunshot wound.  When emergency personnel arrived, Officer
Messer left the victim and assisted other officers in searching for possible
victims, suspects, and weapons.  During
this search, Officer Messer observed the shotgun and handgun on a shelf in an
open closet in the upstairs bedroom. 
Officer Messer advised the sergeant, but by then, officers had
determined that there were no other suspects or victims and Officer Messer was
ordered outside to secure the perimeter of the premises.  Officer Messer testified that he did not tag
the shotgun as evidence nor was he told by anyone where this evidence was
located.

Based on the facts
and circumstances known to the police at the time of their initial search, they
could have reasonably believed that they had to enter and search Appellant=s residence in order to protect or
preserve life or avoid serious injury. 
At the time of the search, officers knew that a shooting had occurred at
a family residence and no weapon was immediately found near the suspect or the
victim.  Officers knew that there was at
least one child in the residence, but could have reasonably believed that other
family members had been injured or that other suspects involved in the shooting
were in the house.  Under these
circumstances, the emergency doctrine applied and therefore, the officers=
warrantless entry and search of Appellant=s residence was justified.  The trial court did not abuse its discretion
in admitting physical evidence seen, but not seized during the officer=s initial search of the residence. 

Consent
to Search













We next consider
whether Appellant=s written
consent to search was freely and voluntarily given.  Consent to search is an
well-established exception to the constitutional requirements of both a warrant
and probable cause.  See U.S. Const. Amend. IV;
Tex.Const. art. I, ' 9; Schneckloth
v. Bustamonte, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043-44, 36 L.Ed.2d 854 (1973); State v.
Ibarra, 953 S.W.2d 242, 243 (Tex.Crim.App. 1997).  If the State obtains voluntary consent to a warrantless search neither the United States nor the Texas
Constitutions are violated.  Brimage, 918 S.W.2d at 480.  The State must establish by clear and
convincing evidence that an accused gave consent positively and unequivocally
and there must not be duress or coercion, actual or implied.[4]  Ibarra, 953 S.W.2d
at 245; Paulus v. State, 633 S.W.2d
827, 850 (Tex.Crim.App. 1981); Chavarria
v. State, 876 S.W.2d 388, 392 (Tex.App.--El Paso
1994, no pet.).  Consent must be
voluntary and neither physically nor psychologically coerced.  Juarez v. State, 758 S.W.2d 772, 775 (Tex.Crim.App. 1988), overruled on other grounds by, Boyle
v. State, 820 S.W.2d 122, 132 n.10 (Tex.Crim.App.
1989), cert. denied, 503 U.S. 921, 112 S.Ct.
1297, 117 L.Ed.2d 520 (1992); Meeks v. State, 692 S.W.2d 504, 509 (Tex.Crim.App. 1985). 
The voluntariness of a consent
to search is a question of fact to be determined from the totality of the
circumstances.  Ohio
v. Robinette, 519 U.S. 33, 40, 117 S.Ct. 417,
421, 136 L.Ed.2d 347 (1996); Juarez, 758 S.W.2d at 775.  Appellant was under arrest or in custody at
the time he gave his consent to search. 
However, the fact that a person is under arrest does not inherently
render his consent to search involuntary. 
Juarez, 758 S.W.2d at 775; Chavarria, 876 S.W.2d at 392.  Rather, it is merely one of the circumstances
to be considered.  Williams
v. State, 937 S.W.2d 23, 28-9 (Tex.App.--Houston
[1st Dist.] 1996, pet. ref=d,
untimely filed).

Appellant contends
that the description of him at the scene, at the hospital, and his medical
conditions at and near the time of the purported consent all indicate that it
was not voluntarily given or understandingly made.  At trial, Officer Estrada testified that
while Appellant was sitting in the patrol unit at the scene, Appellant seemed
to go into a seizure, rocking back and forth or side to side.  Appellant was then transported to the
hospital.  During the ambulance ride,
Appellant complained of having trouble breathing and was administered oxygen,
but eventually passed out.  According to
Nurse Wanda Guerrero Sanchez, Appellant arrived at the hospital at 11:45
p.m.  Initially, Appellant was not
voicing complaints because he would not talk to medical staff.  An attending physician=s
assistant dropped a metal tray on the floor in Appellant=s
room, causing Appellant to jump and act fully awake.  According to Ms. Sanchez, Appellant did
not seem to be in a state of shock and did not exhibit any symptoms consistent
with a postictal state following a seizure.  At 11:45 p.m., Officer Mark Fernandez was
dispatched to the hospital to obtain evidence and to take photographs.  Once Officer Fernandez met Appellant, he took
photographs to document his condition.  A
photograph introduced into evidence shows Appellant laying
on a hospital bed with one leg extended and the other bent at the knee and
resting on the bed.  The photograph
indicates that Appellant was conscious at the time.  Officer Fernandez collected Appellant=s clothing, which contained suspected
traces of blood.  The officer recalled
that Appellant=s
demeanor at that time was just sort of calm and that nothing stood out.








Detective Chavarria arrived at the hospital at approximately 12:45
a.m.  Upon arriving, Detective Chavarria introduced himself to Appellant and asked him how
he was doing.  Detective Chavarria read Appellant his Miranda rights and read
the consent to search form to Appellant, which notified Appellant of his right
to refuse consent to the search.  The
express language of the consent form states AThis written permission is being given by me to the above
named persons voluntarily and without threats or promises of any kind.@ 
According to Detective Chavarria, Appellant
read the form, understood it, and signed it. 
Appellant did not indicate to Detective Chavarria
in any way that he could not sign the form. 
Appellant was cleared by medical staff and the attending physician
released Appellant into police custody at 1:05 a.m.

After reviewing the
totality of the circumstances, we find there is no evidence to indicate
Appellant=s consent
was obtained by duress or coercion, actual or implied.  Rather, the trial court could reasonably
conclude that there was clear and convincing evidence that Appellant
voluntarily consented to the search. 
Finding no abuse of discretion, we conclude the trial court did not err
in refusing to suppress evidence seized from Appellant=s
home based on Appellant=s
consent to search.  We overrule Issues
Five and Six.

Voluntary
Statement








In Issues Seven
and Eight, Appellant contends the trial court erred in admitting Appellant=s purported statement to police because
it was not voluntarily given.  In his
brief, Appellant argues that the circumstances surrounding his confession
render it involuntary, specifically evidence that:  (1) he had suffered a post traumatic shock to
the extent and degree that he lost consciousness; (2) had previously invoked
his right to remain silent and had refused to answer questions; (3) had been
drinking alcohol; (4) was stripped of his clothes; (5) had not had adequate
sleep or food; and (6) had been anxious to complete the statement because the
detective told him he would have to complete the statement before the detective
could check on his wife=s
status.

A statement is
involuntary if the record reflects Aofficial,
coercive conduct of such a nature that any statement obtained thereby was
unlikely to have been the product of an essentially free and unconstrained
choice by its maker.@  Alvarado v. State,
912 S.W.2d 199, 211 (Tex.Crim.App. 1995).  The voluntariness
of a confession is determined by considering the totality of the circumstances
under which the statement was obtained.  Creager v. State, 952 S.W.2d 852, 855 (Tex.Crim.App. 1997); Penry
v. State, 903 S.W.2d 715, 744 (Tex.Crim.App.
1995), cert. denied, 516 U.S. 977, 116 S.Ct.
480, 133 L.Ed.2d 408 (1995).  The
ultimate question in determining voluntariness of the
statement is whether the defendant=s
will was overborne.  See
Creager, 952 S.W.2d at 856, citing, Armstrong
v. State, 718 S.W.2d 686, 693 (Tex.Crim.App.
1985).

A defendant=s mental condition alone is not
determinative of the voluntariness of the confession,
but is only one factor to be considered. 
See Penry, 903 S.W.2d
at 744.  The question becomes one
of whether the accused=s
mental impairment is so great that it rendered him incapable of understanding
the meaning and effect of his statement. 
See Casias v. State,
452 S.W.2d 483, 488 (Tex.Crim.App. 1970); Reed v.
State, 59 S.W.3d 278, 281-82 (Tex.App.--Fort
Worth 2001, pet. ref=d).  Emotional confusion brought about by the
stress of the situation is relevant to the voluntariness
determination, but is only one of the circumstances that must be
considered.  Ballestro
v. State, 640 S.W.2d 423, 426 (Tex.App.--San
Antonio 1982, no pet.); see also Gonzales v. State, 807 S.W.2d 830, 833
(Tex.App.--Houston [1st Dist.] 1991, pet. ref=d) (Mere emotionalism or confusion
alone does not render a confession inadmissible.).  








At the suppression
hearing, Officer Estrada testified that after Appellant was taken into custody,
he escorted Appellant to the patrol unit. 
Officer Estrada read Appellant his Miranda rights prior to his
partner asking Appellant where the weapons were in the house.  Officer Estrada recalled that at the time, Appellant seemed calm, but a little out of it, almost in
shock.  Appellant affirmatively replied
that he understood his rights.  Officer
Estrada had no further discussions with Appellant.  Appellant, however, became more hysterical,
yelling out for his son and wife. 
Officer Estrada observed Appellant=s
eyes begin to roll back, and he started rocking back and forth.  Officers pulled Appellant out of the patrol
unit and called EMS.  Appellant had
calmed down, but was still breathing rapidly and taking shallow breaths.  While transporting Appellant to the hospital,
Appellant was given oxygen, but eventually passed out.  Officer George Spencer also testified at the
hearing and recalled that when they first arrived at the hospital, Appellant=s eyes were open and he was not saying
anything. 








Nurse Wanda
Guerrero Sanchez testified at the hearing and stated that in the medical
paperwork she had noted that the patient, Appellant, was refusing to answer
questions when the technician initially saw him at 11:45 p.m., and again at
11:50 p.m. when she was in the room.  At
that point, the physician=s
assistant on duty walked into the room, talked to Appellant, but Appellant was
not answering him.  The assistant then
purposely dropped a metal tray out of Appellant=s
line of vision, causing a loud noise. 
Appellant immediately started answering and asking questions and
responding to medical staff.  Appellant
was seen by the attending physician at 12:15 a.m.  Ms. Sanchez recalled that a forensic officer
came around 12:30 a.m. and tested Appellant=s
hands and collected his clothes.  When
Ms. Sanchez drew Appellant=s
blood for lab work at 12:45 a.m., Appellant was cooperating and talking to
her.  Appellant admitted to her that he
had drunk four beers, but his blood alcohol test results indicated he was about
half under the legally drunk limit.  In
Ms. Sanchez=s
opinion, Appellant did not appear to be in a post-seizure like state.  In her nursing notes, Ms. Sanchez noted that
at 12:55 a.m., Appellant=s
eyes were open, he was verbally responsive, oriented, conversing, his motor
responses were normal, and his pupil size was three and reactive.  The attending physician later cleared
Appellant for release.  Appellant left
the hospital wearing two hospital nightgown robes, shoe covers, and a
blanket.  Officers Estrada and Spencer
escorted Appellant to the Crimes Against Persons
office at the police station and had no discussions with Appellant.








At the suppression
hearing, Detective Chavarria testified that he
arrived at the hospital at approximately 12:30 a.m. and located Appellant in
the emergency room in police custody. 
Appellant was being attended to by a nurse and had one arm handcuffed to
the bed railing.  When the nurse left,
Detective Chavarria approached Appellant, introduced
himself, and asked Appellant how he was doing, to which Appellant replied, Afine.@  The detective then asked Appellant for his
consent to search his residence and reviewed the consent form with
Appellant.  Appellant then signed the
form.  When Appellant arrived at the CAP
office, he was escorted to the interview room. 
Detective Chavarria read Appellant his
Miranda rights from a card and then Appellant read aloud these rights off
of the card.  Appellant initialed each
right, affirmatively answered that he understood his rights, and signed the Miranda
warning card at 1:44 a.m.  Detective Chavarria talked with Appellant for about forty minutes
before taking a written statement.  They
moved to Detective Chavarria=s
cubicle and began taking the statement at 2:25 a.m.  As Detective Chavarria
was typing up the statement, Appellant was allowed to read along.  Once it was completed at 3:27 a.m., Appellant
read it from the computer monitor and then read a printed copy.  Appellant initialed each paragraph of the
statement as he read.  Two other officers
witnessed Appellant signing the statement. 
Detective Chavarria recalled that Appellant
was not handcuffed at any time during his conversations with Appellant in the
interview or at the cubicle.  When
Appellant arrived at the station, he requested to use the restroom and was
allowed to do so and Appellant later asked for coffee and was given some
coffee.  According to Detective Chavarria, Appellant=s
demeanor was calm, he did not appear under the influence of any kind of
substance, and the detective had no concerns that Appellant was not mentally
capable of giving a statement because Appellant was fine.

On
cross-examination, Detective Chavarria stated that he
could not recall how many times in the interview room Appellant asked how his
wife was doing.  He did not recall, but
said it was possible that he might have told Appellant that they would find out
how his wife was doing after the statement. 
However, Detective Chavarria stated that
Appellant never indicated that they hurry up with the statement for that
purpose.  Detective Chavarria
stated that Appellant seemed very alert and did not seem tired.  On redirect, Detective Chavarria
denied promising Appellant anything for his confession, and denied telling
Appellant that he was not going to tell him what state his wife was in until he
finished giving the statement.  








At trial,
Appellant testified about his statement and the surrounding circumstances.  According to Appellant, while he was in the
patrol car he started having some flashbacks about his mother who had died in
an accident.  He started having trouble
breathing and passed out.  His next
memory was hearing a loud noise and being in the hospital, handcuffed to the
bed.  The next thing he remembered was
being in the station.  Appellant kept
asking Detective Chavarria to find out how his wife
was doing, but the detective would not tell him.  Appellant recalled that Detective Chavarria told him that they needed to make a statement
first.  Appellant asked repeatedly, but
the detective kept on telling him to make the statement first.  Appellant testified that he signed the
statement, but never read it because he wanted to know how his wife was
doing.  Appellant stated that he told the
detective that he never loaded the shotgun. 
On 

cross-examination,
the State questioned Appellant about his voluntary statement.  Appellant stated that Detective Chavarria promised him that he would let him know what
happened to his wife if he gave him the statement.  Appellant again denied telling Detective Chavarria that the shotgun was loaded.  

After reviewing
the totality of the circumstances, we find there is evidence supportive of the
trial court=s implied
finding that Appellant=s
statement was voluntarily given.  There
is no evidence in the record that indicates any coercive conduct by the police
officers.  While Appellant testified that
he was suffering from flashbacks before losing consciousness, other witness
testimony indicates that he was medically cleared for release at the hospital
and that nothing was wrong with him.  Ms.
Sanchez testified that Appellant initially refused to talk to medical staff,
but after the metal tray dropped, Appellant was lucid and answering
questions.  Although Appellant had been
drinking, the medical records indicate he was not legally drunk while at the
hospital.  While Appellant testified he
was anxious to complete the statement, Detective Chavarria
stated that Appellant never indicated that desire to him,
and the detective denied promising Appellant anything for his confession or
specifically telling Appellant he would not tell Appellant information about
his wife=s
condition until he finished the statement. 
Finding no abuse of discretion, we conclude the trial court did not err
in denying Appellant=s
motion to suppress and in admitting the written statement into evidence.  Issues Seven and Eight are overruled.  








For the reasons
stated above, we affirm the trial court=s
judgment.

 

 

January 22, 2004

DAVID WELLINGTON CHEW, Justice

 

Before Panel No. 2

Barajas, C.J., McClure, and Chew, JJ.

 

(Do Not Publish)











[1]
Officer Gabriel Espalin bagged Appellant=s hands while Appellant was at the
patrol unit.  Appellant was crying at the
time, but according to Officer Espalin, Appellant was
not rocking back and forth in the car until after his hands were bagged.





[2]
By letter brief, the State contends that Appellant has waived his first four
issues on appeal because he failed to object to the jury charge and thereby
invoked the benefit of the lesser offense and is estopped
from challenging the sufficiency of the evidence to sustain his conviction for
that lesser offense.  See State v. Lee,
818 S.W.2d 778, 781 (Tex.Crim.App. 1991)(plurality opinion), overruled on other grounds by, Moore
v. State, 969 S.W.2d 4 (Tex.Crim.App. 1998).  In State v. Lee, the Texas Court of
Criminal Appeals in a plurality opinion held that a defendant Aby invoking the benefit of the lesser
included offense charge at trial [,] in not objecting to its submission to the
jury, and in fact by requesting that such instructions be included, appellant
is estopped from then complaining on appeal that the
evidence failed to establish all the elements of that lesser offense.@ 
Lee, 818 S.W.2d at 781.  The appellant in State v. Lee was
charged with murder and requested the lesser-included offense of voluntary
manslaughter and the jury found him guilty of the lesser offense.  Id. at 778-80.  On appeal, the appellant challenged the
essential element of  Asudden passion@
for a voluntary manslaughter conviction, an additional and distinctive element
that the State did not bear the burden of proving in its prosecution of the
greater offense.  See id. at 781; see also Vann v. State, 853 S.W.2d 243, 246 (Tex.App.--Corpus Christi 1993, pet. ref=d)(discussing State v. Lee and
the prior distinction between murder and voluntary manslaughter).  We find that the holding of State v. Lee
is inapplicable in this case, as the charged offense and the lesser offenses
differ only in culpable mental states, and therefore will address the merits of
Appellant=s first
four issues.  See
Vann, 853 S.W.2d at 247 (concern in State v. Lee attaches only to
the sudden passion issue).  





[3]
The Texas Court of Criminal Appeals recently clarified the emergency doctrine
exception to the warrant requirement in Laney v. State, 117 S.W.3d 854 (Tex.Crim.App. 2003). 
In Laney, the Court noted that although the emergency doctrine is
considered synonymous with 
the exigent circumstances doctrine, there is a narrow, but
critical distinction between the two.  Laney,
117 S.W.3d at 861. 
The exigent circumstances applies when the police are acting in their Acrime-fighting@
role, while the emergency doctrine applies when the police are acting in their
limited community caretaking role to Aprotect
or preserve life or avoid serious injury.@  Id. 






[4]
The federal constitution requires that proof of consent to search be shown by a
preponderance of the evidence, while the Texas Constitution requires the State
to prove by clear and convincing evidence that the consent to search was
voluntary.  See United States v. Hurtado, 905 F.2d 74, 75 (5th Cir. 1990)(preponderance of the evidence); Ibarra, 953 S.W.2d
at 245.